# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 5:11cv48

| | | |
|---|---|---|
| **WELLS FARGO ADVISORS, LLC,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| **CLIFFORD J. WATTS, III,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

Review and confirmation of the arbitration process by the federal courts has

reached the point that when this court observed, in a hearing on the claimant bank's

motion to confirm an arbitration award, that the court could refuse to enforce an illegal

contract, counsel for the claimant bank immediately challenged the court's statement.

Hrg. Tr. 71, docket no. 33. As counsel's open challenge to the court's review

authority makes clear, arbitration under the Federal Arbitration Act is a process that,

although retaining the appearance of constitutionality by involving the courts in

confirming an award, does not even attempt to retain the appearance of fairness.[1]  In

the hearing before this court on the claimant bank's motion to confirm an arbitration

---

[1]  As one author has noted, "[a]rbitration is 'despotic decisionmaking' in the sense that the governing law makes arbitrator's decisions virtually unreviewable while accepting procedural and substantive results that would be considered unfair in a judicial setting."  David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration*, 1997 WIS. L. REV. 33, 38 (1997).

award, counsel for the claimant bank noted that the bank handles hundreds of arbitrations a year and that counsel herself handles 30 to 40 a year and that she, by the way, has never lost a *single* case. Tr. 52 ("I've never lost one and I've never not gotten attorney's fees. I *always* win these cases.") (emphasis added). Now *there's* a level playing field.

Because of its constant and prolific participation in FAA arbitration, the claimant bank enjoys a clear advantage over the individual employee or customer. That is, the arbitration company or arbiter knows that the bank will participate in hundreds of arbitrations a year, whereas an individual employee or customer may participate in arbitration only once in their lifetime, if ever. The bank will know from experience, then, which arbiters are the most likely to favor the bank; therefore, the bank will naturally choose that arbiter to arbitrate the bank's case. The individual, on the other hand, has very limited knowledge of the arbiter. Couple that with the proposition that the arbiter's mistakes of facts or law are not reviewable by the courts and the result is a process in which, as in this case, counsel for the bank can remain undefeated 30 or 40 times a year. Tr. 52.

Counsel's argument that the parties voluntarily agreed to arbitration and that the process saves money is also disingenuous. Since financial institutions and large employers have virtually all of the available lending capital and a large number of the

jobs, individuals have no recourse but to agree to an arbitration clause. Further, since the individuals seldom win and are forced to reimburse costs and attorney fees, the only ones saving money are large institutions like the claimant.

Had the contract in this case been an illegal one, this court would have refused to confirm the award. However, as the contract is not illegal, the court has reviewed the award under current applicable law and finds that the bank is entitled to have its award confirmed. The court will not, however, confirm the award of attorney's fees for the reasons stated below.

## I.    Background

This matter is before the court on a motion to vacate an arbitration award [docket no. 1] by Respondent Clifford J. Watts, III, in which an arbitration panel ordered Watts to pay Wells Fargo $229,060.52 pursuant to a promissory note executed by Watts, as well as more than $60,000 in attorney's fees. Wells Fargo has, in turn, filed a motion to confirm the arbitration award [docket no. 14].

### A.    Events Leading to Arbitration

Respondent Watts was at all relevant times a financial broker for Wells Fargo. On October 24, 2007, Watts signed a promissory note in favor of his former employer Wachovia (which was later bought by Wells Fargo).[2]  (Promissory Note, Ex. B to

---

[2]  The promissory note was executed as part of a transaction that is commonly used in the financial industry as a means for financial firms to retain their brokers'

Motion to Confirm, docket no. 15.) The original amount owed on the note was $306,726. Under the terms of the note, Watts agreed to pay the $306,726, plus interest, at the rate of 4.35% annum, as follows: Watts was to pay $5,097.57, plus accrued interest, each month, beginning February 2008 through September 2013. The note stated that, upon termination for any reason the note, plus interest, would become due and payable. The note further stated that the parties agreed to submit any claims under the note to binding arbitration before the Financial Industry Regulatory Authority ("FINRA").

Watts voluntarily resigned from Wells Fargo on July 2, 2009, and refused to pay the amount owed on the note. Wells Fargo thereafter filed a statement of claim before FINRA to recover almost $237,000 under the promissory note executed by Watts, plus $5,569.96 that was allegedly owed to Wells Fargo under a Wells Fargo Branch Manager Retention Award Program. (FINRA Arbitration No. 09-05736, Ex. A to Motion to Confirm, docket no. 15.) Watts filed the following counterclaims relating to alleged changes made by Wells Fargo as to Watts' terms of employment and compensation: breach of contract; fraud, in violation of the North Carolina Wage and Hour Act; deceptive, defamatory, and illegal behavior in an attempt to retain

employment. (*See* IRS Technical Advice Memorandum ("TAM"), No. 200040004 (Oct. 6, 2000), Ex. 1 to Response to Motion to Confirm, docket no. 25) (explaining loan bonus retention programs).

business; unlawful and fraudulent seizure of assets; and unfair trade practices.

In the FINRA arbitration, Watts argued that the loan under the promissory note was not actually a loan, but that it was merely a bonus related to Wachovia's acquisition of Watts' former employer A.G. Edwards. Watts argued that, after agreeing to the bonus, Wachovia materially changed the terms of Watts' employment, compensation, and other terms by which Watts was required to conduct his business. Watts further argued that the changes materially breached the employment contract, the Retention Bonus Agreement, and the Branch Manager Retention Bonus. Watts argued that the effect of the breaches amounted to constructive termination, which forced Watts to seek alternative employment.

B.    The Arbitration Award

On March 10, 2011, a three-member FINRA panel unanimously ruled in Wells Fargo's favor. (FINRA Arbitration No. 09-05736, Ex. A to Motion to Confirm, docket no. 15.) The panel ordered Watts to pay $229,060.52, plus interest for the amount still owed on the note; Wells Fargo's costs in the amount of $2,717.33; and Wells Fargo's attorney's fees in the amount of $60,480.25.

On April 11, 2011, Watts filed the pending motion to vacate. Watts seeks to have the court vacate the arbitration award based on the following arguments: (1) the award was procured by fraudulent and undue means; (2) the panel was partial in favor

of Wells Fargo; (3) the panel denied Watts a fundamentally fair hearing by depriving

Watts of access to material evidence exclusively controlled by Wells Fargo; and (4)

the panel manifestly disregarded the law by failing to enforce the governing rules of

arbitration and its own orders and by ignoring uncontroverted evidence of breach of

contract.  On May 9, 2011, Wells Fargo filed a corresponding motion to confirm the

arbitration award.

## II.    Standard Applicable to Review of Arbitration Awards

On a motion to vacate an arbitrator's award under the Federal Arbitration Act

("FAA"), the federal court's review is exceedingly narrow.  *See Apex Plumbing*

*Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998); *Upshur Coals Corp.*

*v. United Mine Workers of Am.*, 933 F.2d 225, 229 (4th Cir. 1991).  The FAA, 9 U.S.C.

§ 10(a), lists four specific grounds by which a court can vacate an arbitration award:

(a)    In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). Furthermore, under federal common law, a court may vacate an arbitration award where the arbitrators acted in manifest disregard of the law.[3] *See Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (4th Cir. 2006).

On a motion to confirm an arbitrator's award, the court "must grant such an order unless the award is vacated, modified or corrected" as specified in Sections 10 and 11 of the FAA.[4] 9 U.S.C. § 9. The narrow standard of review in the context of a motion to vacate an award also applies in a corresponding motion to confirm an award. *See, e.g., Jih v. Long & Foster Real Estate, Inc.*, 800 F. Supp. 312, 317 (D.

---

[3] The federal common law standard of "manifest disregard" may no longer be viable under the Supreme Court decision of *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008), in which the Court stated that the statutory grounds for vacatur are the exclusive grounds for vacatur. *See MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 857 n.5 (4th Cir. 2010) (discussing *Hall Street Associates*).

[4] Section 9 of Title 9 states, in pertinent part:

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

9 U.S.C. § 9.

7

Md. 1992) (discussing the narrow standard of review for arbitration awards and the substantial showing required to avoid confirmation); *Md. Transit Admin. v. Nat'l R.R. Passenger Corp.*, 372 F. Supp. 2d 478, 481-83 (D. Md. 2005) (same).

The deference given to the arbitrator's findings extends to factual findings as well as legal interpretations. *See Upshur Coals Corp.*, 933 F.2d at 229. Thus, in reviewing arbitration awards, courts "are confined to ascertaining 'whether the arbitrators did the job they were told to do–not whether they did it well, or correctly, or reasonably, but simply whether they did it.'" *Md. Transit Admin.*, 372 F. Supp. 2d at 482-83 (quoting *Richmond, Fredericksburg & Potomac R.R. v. Transp. Commc'ns Int'l Union*, 973 F.2d 276, 281 (4th Cir. 1992)).

## III. Discussion

A. Watts' Contention that Vacatur is Appropriate Because the Arbitration Panel Engaged in Conduct Warranting Vacatur under 9 U.S.C. § 10(a).

As noted previously, a court may vacate an arbitration award where (1) the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the

arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a). In the motion to vacate, Watts essentially argues that vacatur is warranted under the first three grounds listed in Section 10(a).

Watts first contends that Wells Fargo procured the motion by fraud and undue means by refusing to comply with discovery orders issued by the panel and by intentionally misrepresenting whether certain evidence was available for discovery. Thus, Watts contends that vacatur is appropriate pursuant to 9 U.S.C. § 10(a)(1). The court finds that Watts has not shown any such conduct by Wells Fargo. Watts contends essentially that Wells Fargo hid from discovery during arbitration certain evidence that would have shown that Wells Fargo misled Watts into believing that his retention bonus was not really a loan, but that it was structured as a loan for tax purposes only. Watts has failed to show any such fraud by Wells Fargo. Thus, Watts fails to show that vacatur is warranted under 9 U.S.C. § 10(a)(1).[5]

Watts next contends that vacatur is appropriate based on "evident partiality or corruption" by the arbitration panel under 9 U.S.C. § 10(a)(2). A party challenging an arbitration award based on "evident partiality or corruption" must show that the

_____

[5] In any event, and as the court discusses *infra*, any subjective belief that Watts had as to the effect of the promissory note is simply not relevant, as the court simply looks to the four corners of the note to ascertain the agreement between the parties.

alleged partiality is "direct, definite and capable of demonstration rather than remote, uncertain and speculative." *Gianelli Money Purchase Plan & Trust v. ADM Investor Servs., Inc.*, 146 F.3d 1309, 1312 (11th Cir. 1998) (quoting *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1202 (11th Cir. 1982)). The party seeking vacatur must point to evidence of an actual conflict of interest or identify a business or other connection that might create a reasonable impression of possible bias that the arbitrator failed to disclose. *See id.* at 1312-13.

Here, Watts does not present any evidence of an actual conflict of interest or identify a business or other connection that might create a reasonable impression of possible bias that the arbitration panel failed to disclose. Rather, Watts merely argues that the arbitrators *must have been* biased towards Wells Fargo because of their rulings in favor of Wells Fargo on Watts' various discovery requests and on Watts' motion to compel regarding discovery. Watts has simply not shown the prerequisite conflicts of interest, or personal and social relationships, between the arbitrators and Wells Fargo, to prove "evident partiality or corruption" by the arbitrators under 9 U.S.C. § 10(a)(2); *see Metter v. Wachovia Sec., LLC*, No. 08cv2239, 2008 WL 4395086, at *2 (N.D. Ill. Sept. 23, 2008) ("Plaintiff's argument that the panel was wrong in its decision is insufficient to show that the arbitrators were partial or biased.").

Next, Watts contends that the panel failed to timely address his discovery

objections, failed to timely rule on his motion to compel, failed to enforce time deadlines, failed to order the production of documents, failed to enforce the panel's own discovery order, failed to postpone the hearing, failed to order the testimony of various witnesses, and failed to follow FINRA's Arbitrator's Guide. Thus, here, Watts argues that vacatur is warranted under Section 10(a)(3).

Watts' argument has no merit. As Wells Fargo notes, the panel received hundreds of pages of argument in support of Watts' argument to compel, heard oral argument regarding Wells Fargo's alleged discovery abuses both before and throughout the hearing, ruled on Watts' discovery and evidentiary motions, compelled production of certain documents, and conducted a four-day evidentiary hearing. As Wells Fargo notes, every discovery and evidentiary issue raised by Watts in support of his motion to vacate was raised before and decided by the panel. It is well established that courts must give great deference to arbitrators' discovery and evidentiary rulings. *See, e.g., Richmond, Fredericksburg & Potomac R.R.*, 973 F.2d at 282-83 (reinstating an arbitration award where a discovery issue before the court had previously been denied by the arbitrator). Furthermore, the court must defer to the panel's discovery and evidentiary rulings even if the court would have ruled differently. *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 146 (4th Cir. 1994) ("Courts are not free to overturn an arbitral result because they would have reached a different

conclusion if presented with the same facts."). The fact that Watts disagrees with the various discovery rulings is not a ground for vacatur. Rather, the panel's discovery rulings may not be overturned unless they were in bad faith or so gross as to amount to affirmative misconduct. *See United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 (1987) (reversing the lower court's granting of a motion to vacate because, even assuming "that the arbitrator erred in refusing to consider the disputed evidence, his error was not in bad faith or so gross as to amount to affirmative misconduct"). Watts has simply not shown such conduct in this case.

Finally, even assuming that the panel erred in ruling on various discovery and evidentiary issues, vacatur would still not be appropriate because Watts has failed to show that he was prejudiced by such errors. When a party challenges an evidentiary decision of the arbitration panel, a federal court may vacate the award only if the arbitrator's refusal to hear pertinent and material evidence prejudiced the rights of the parties to the arbitration proceedings. *Rosensweig v. Morgan Stanley & Co.*, 494 F.3d 1328, 1333 (11th Cir. 2007); *Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1490 (9th Cir. 1991) (stating that "a showing of prejudice is a prerequisite to relief based on an arbitration panel's evidentiary rulings"). Here, Watts has failed to cite to any evidence that, if presented to the panel, would have changed the panel's ruling.

In sum, the court finds that Watts has failed to show that vacatur is warranted under any of the four grounds listed in Section 10(a). Furthermore, to the extent that Watts argues additionally that the panel's award was in manifest disregard of the law, Watts has simply failed to meet this burden of proof. Here, the panel simply awarded to Wells Fargo the amount owed by Watts under the promissory note. Contrary to showing a manifest disregard of the law, the panel specifically followed the law, in that Watts was clearly liable for the amount remaining on the promissory note under the terms of the note.

B.     Watts' Contention that Vacatur is Necessary Because the Promissory Note Is an Illegal Contract

In his brief in response to Wells Fargo's motion to confirm the arbitration award, Watts contends that the promissory note is illegal and unenforceable because it is, in fact, a loan bonus arrangement containing an illegal non-solicitation provision. The court first notes that, according to Wells Fargo, Watts did not question the validity of the promissory note in his brief in support of his motion to vacate, and that he only raised it as an affirmative defense in opposition to Wells Fargo's motion to confirm. Wells Fargo further contends that although Watts argued illegality of the note in passing at the hearing before the arbitration panel, he did not present any of the arguments that he set forth in opposition to Wells Fargo's motion to confirm.

Wells Fargo contends, therefore, that Watts has waived any arguments regarding the illegality of the promissory note.

In response, Watts contends that he did argue to the arbitrators that the promissory note is illegal. Watts further contends that, in any event, regardless of the deference owed to the arbitration panel, this court may not enter an order that enforces an illegal contract. A court is not required to defer to an arbitration panel's ruling regarding the legality of a contract if the contract violates public policy. *See W.R. Grace & Co. v. Local Union 759, Int'l Union of Rubber Workers*, 461 U.S. 757, 766 (1983); *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 150 (4th Cir. 1994). This is a narrow exception, however, and courts have stated that the public policy must by explicit, well-defined, and dominant, and it must be "one that specifically militates against the relief ordered by the arbitrator." *Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 174 (9th Cir. 1996) (internal quotation marks and citations omitted)). Therefore, the court does not agree with Wells Fargo's contention that the court *must always* defer to the panel's conclusion regarding the validity of a contract, and the court will therefore address Watts' argument regarding the validity of the note.

1.      IRS Technical Advice Memorandum ("TAM"), No. 200040004

In contending that the promissory note is an illegal contract, plaintiff first points

to IRS Technical Advice Memorandum ("TAM"), No. 200040004 (Oct. 6, 2000).

(Ex. 1 to Response to Motion to Confirm, docket no. 25.) The TAM was in response

to an employer taxpayer's inquiry as to whether the employer's payments to

participating employees under a "promissory note and pledge agreement" and a

"bonus agreement" constitute compensation for future services or the proceeds of a

bona fide loan; and (2) if the payments constitute compensation for future service,

whether the employer may deduct the payments in the year under Section 162 of the

Internal Revenue Code. (*Id*. p. 1.)

In response to the employer taxpayer's inquiry, the IRS determined in the TAM

that payments made from the employer to the employee pursuant to the promissory

notes may not be treated as bona fide loans for purposes of the employer's tax

treatment. The TAM states that "although the transactions appear to be in form, bona

fide loans . . . in substance the upfront payments constitute compensation includible

in gross income upon receipt." (*Id*. p. 5.) The IRS TAM explains that, with

arrangements such as the one here involving a promissory note and a loan bonus

agreement, "the employee receives a bonus payment and must immediately use this

money to make payment on the loan." (*Id*. p. 7.) The IRS TAM states that the

"circular flow of funds between the parties should be disregarded for tax purposes,

because it lacks a business purpose and economic substance and appears to be

motivated solely by tax avoidance considerations, rather than by any independent nontax purpose." (*Id*.)

The IRS TAM does not determine, as Watts contends, that promissory notes such as the one in this case are "illegal contracts." Rather, the TAM addresses the tax treatment of the employer taxpayer and concludes that "[a] cash expenditure is not present because the 'lender' (Taxpayer) provides the funds [in the form of bonus payments] with which the 'borrowers' make an immediate repayment on the loans." (*Id*. p. 6.) Indeed, the IRS TAM itself recognizes that the employee will generally be obligated to repay the loan upon default. (*See id*. p. 7, "if the employee leaves before the end of the required period of service, the employee *generally will be required to pay* the balance due on the loan"; p. 5, "[t]he employee *will be required to repay* a portion of the up-front payment [] if the employee leaves Taxpayer's employ before the end of the required period of service") (emphases added). The IRS TAM further states that "the tax treatment of the individual employees is not at issue and is not intended to be resolved in this [TAM]."[6] (*Id*. p. 6.) In sum, the IRS TAM does *not* state that promissory notes such as the one in this case are illegal contracts.

2. The Non-Solicitation Provision in the Promissory Note

Watts also contends that the promissory note contains numerous illegal terms

---

[6] The TAM further specifically states that it "may not be used or cited as precedent." (*Id*. p. 8.)

that constitute an illegal attempt to restrain trade and, therefore, the note should not be enforced as against public policy. For instance, Watts contends that the non-solicitation provision in the promissory note is illegal and was used to justify anti-competitive threats. The non-solicitation provision in the note states:

> In consideration of the amounts advanced by Wachovia to you and evidenced by this Note, you agree that if your employment with Wachovia or any successor company ends for any reason before the entire amount of this Note has been paid in full, FOR A PERIOD OF ONE YEAR THEREAFTER, you will not solicit, directly or indirectly, the business or accounts of any of the customers of Wachovia (a) serviced by you during your employment with Wachovia or (b) whose names became known to you while employed by Wachovia until such time as you have paid Wachovia the remaining unpaid principal balance and accrued interest then owed under this Note. This nonsolicitation covenant will terminate and be of no further force and effect after the remaining unpaid principal balance and accrued interest due under this Note have been paid in full pursuant to the terms thereof. You acknowledge that a breach of this nonsolicitation covenant may result in Wachovia or any successor company serving immediate and irreparable harm, and therefore consent to the issuance of a temporary restraining order or other injunctive relief to enforce the terms of such nonsolicitation covenant.

(Promissory Note, Ex. B to Motion to Confirm, docket no. 15.)

Here, the non-solicitation provision does not render the promissory note unenforceable. First, it is undisputed that Wells Fargo did not attempt to enforce the non-solicitation agreement. Furthermore, the promissory note contains an express severability clause, stating that "[i]f any provision of this Note is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Note

will remain in full force and effect." Thus, even if the non-solicitation clause in the note is unenforceable, this fact does not render the entire note unenforceable.

3. The Acceleration Clause and Watts' Public Policy Arguments

Finally, to the extent that Watts contends that the promissory note is void or voidable as against public policy due to its acceleration clause, or because Wells Fargo led Watts to believe that his retention bonus had to be structured as a loan merely for tax purposes, these contentions have no merit. Other courts addressing the same arguments with regard to almost identical promissory notes have recognized the enforceability of such notes.[7] *See, e.g., Alvarado v. Wells Fargo Advisors, LLC*, Civil Action No. 10-0362, 2011 WL 677354 (S.D. Tex. Feb. 15, 2011) (confirming an arbitration award where Wells Fargo sought arbitration against a broker for amounts owed under a promissory note); *see also Metter*, 2008 WL 4395086, at *2. For instance, in *Banus v. Citigroup Global Markets, Inc.*, the plaintiffs made the same argument that Watts makes here–they claimed they were "told that [the loan signing bonus] was structured as a loan solely for tax purposes." No. 09 Civ. 7128(LAK), 2010 WL 1643780, at *10 n.67 (Apr. 23, 2010). The *Banus* court recognized that "[i]n practical effect, then, the so-called signing bonuses were no bonuses at all. They

_____

[7] According to Wells Fargo, retention bonuses and promissory notes almost identical to the one here are "extremely common in the industry and are consistently upheld by courts and FINRA panels as valid and binding contracts." (Reply Br. Supp. Motion to Confirm, p. 8, docket no. 29.)

were compensation advances–loans." *Banus*, 2010 WL 1643780 at *1. The court further stated:

> [T]he plaintiffs' claims for relief in this action were at war with the most basic principles of the law of contracts. They asserted that the Note and the [special compensation agreement] lacked mutuality and consideration and, as a result, were unenforceable. Plaintiffs argued also that the acceleration and imputed interest clauses were unconscionable and violated public policy. These arguments, however, failed on the basis of undisputed facts. Plaintiffs signed the Notes, received substantial loan proceeds (interest free it should be noted), and had the ability to use those proceeds for any purpose they chose, not least of them being the investment of the loan proceeds to generate interest income or capital gains. There was no lack of consideration or mutuality. Nor was there any basis for their challenges to the acceleration and imputed interest clauses. Acceleration clauses are routine and have been upheld repeatedly against arguments that they are unconscionable penalties. In this case, the loan proceeds were paid to the plaintiffs at the start of their employment with CGMI and were to be repaid out of their annual compensation during the continuation of that employment. There was nothing inequitable about accelerating any unpaid balance where a broker ended his term of employment before full repaying the loan.

*Id.* at 10. The *Banus* court further noted that even "any subjective assumptions or understandings that any of the plaintiffs may have had as to [the employer's] motive in giving them the advances for which they signed the notes is immaterial." *Id*. at *10 n.67.

Here, for the same reasons given by the *Banus* court, this court finds that the promissory note in this case was simply not in violation of any public policy, or otherwise illegal, such that the arbitrator's award could be vacated. In sum, Plaintiff

has failed to meet the high burden of showing the existence of any of the elements necessary to vacate the arbitration award.

C.    The Panel's Award of Attorney's Fees to Wells Fargo

In the motion to confirm, Wells Fargo further contends that the court should confirm the arbitrators' award of attorney's fees to Wells Fargo.  As noted, the panel awarded attorney's fees to Wells Fargo in the amount of $60,480.25.  In response, Watts contends that the attorney's fees provision in the promissory note is unenforceable, and the court should therefore vacate the award of attorney's fees.

Under the note, Watts agreed to pay "to pay all reasonable costs and expenses incurred by or on behalf of [Wells Fargo] in connection with its exercise of any or all of its rights and remedies under this Note, including, without limitation, reasonable attorneys' fees."  The note further states that it is governed by Virginia law.[8]  Under Virginia law, the parties may adopt contractual provisions shifting the responsibility for attorney's fees and costs to the losing party.  *West Square, L.L.C. v. Commc'n Techs., Inc.*, 649 S.E.2d 698, 702 (2007).  Here, the court finds that the attorney's fees provision in the note is enforceable.

---

[8]  To the extent that Watts contends that the choice of law provision in the note designating the law of Virginia as governing law is unenforceable, this contention has no merit.  Wells Fargo is the successor to Wachovia.  Wachovia's principal place of business was the State of Virginia when the note was executed.  Thus, designating Virginia law as the governing law was not arbitrary as Watts suggests.

The court is deeply troubled, however, by the manner in which the arbitration panel determined the amount of attorney's fees to be awarded to Wells Fargo. Attorney's fees in federal court are determined by using the so-called lodestar method, which represents the number of hours billed multiplied by a reasonable hourly rate.[9] *See Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 227-28 (4th Cir. 2009).  Under the lodestar analysis, "[t]he party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id*.

Although arbitration panels may not be required to follow any particular legal standard, their decision cannot be patently arbitrary.  It is clear that, in this case, the panel failed to engage in any analysis whatsoever, before ordering Watts to pay Wells Fargo the hefty sum of $60,480.25.

In the hearing before this court on the parties' respective motions to vacate and

---

[9] The Supreme Court has further recognized the following twelve factors as guides to a court's determination of a reasonable hourly rate in a lodestar analysis: (1) time and labor required; (2) novelty and difficulty of the questions; (3) requisite skill needed to perform the service properly; (4) preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Blanchard v. Bergeron*, 489 U.S. 87, 92 n.5 (1989).

confirm the arbitration award, the parties explained the exchange at the arbitration hearing between the panel and Wells Fargo's counsel regarding Wells Fargo's request for attorney's fees. Counsel for Wells Fargo represented to the panel that counsel had incurred around $120,000 in attorney's fees. Counsel did not, however, submit an itemized affidavit, specifically setting forth the hours and duties spent in incurring the attorney's fees. The panel expressed concern that counsel wholly failed to present any documentation to support counsel's statement that Wells Fargo has incurred attorney's fees of $120,000, to which counsel responded that simply submitting an affidavit with no back-up documentation had always been enough in the past. According to Wells Fargo's counsel, the panel chairperson then stated as follows: "Determining an attorney's fees amount based on what you gave me is like pulling the amount out of thin air." (Hr'g Tr., p. 49, lines 20-22, June 21, 2011.) Despite the chairperson's concern over the lack of documentation to support Wells Fargo's request for attorney's fees, the panel did not require counsel for Wells Fargo to provide supporting documentation, even after counsel offered to do so. Rather, the panel simply split Wells Fargo's requested amount in half and awarded Wells Fargo $60,480.25, in the arbiter's own words, "out of thin air." *See* Tr. 80.

Here, it is clear that the arbitration panel in this case did not conduct any analysis whatsoever before assessing attorney's fees against Watts. Rather, the panel

arbitrarily split in half the figure given to it by counsel of $120,000. The panel itself noted that, because of the lack of supporting documentation, it had no basis on which to award attorney's fees. Because the arbitration panel's award was, in its own words, pulled "out of thin air" and, thus, completely arbitrary, this court will vacate the attorney's fee award against Watts.

## ORDER

For the reasons stated herein, the court will **DENIES** Watts' motion to vacate the arbitration award [docket no. 1] with the exception of the award of attorney's fees. To this extent, the court **GRANTS** Wells Fargo's motion to confirm the award with respect to every portion of the award except for the award of attorney's fees. [Docket no. 14]. The award of attorney's fees is **VACATED**.

**IT IS SO ORDERED**.

Signed: March 9, 2012

Max O. Cogburn Jr.
United States District Judge

23